## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

Sep 24 2019, 9:22 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz &
Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Johnny Riley Jonas,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | September 24, 2019<br><br>Court of Appeals Case No.<br>18A-CR-3121<br><br>Appeal from the Jackson Circuit Court<br><br>The Honorable Richard W. Poynter, Judge<br><br>Trial Court Cause No.<br>36C01-1612-F4-27 |

**Baker, Judge.**

[1] Johnny Riley Jonas appeals his convictions and sentence for Level 4 Felony Child Molesting[1] and Level 6 Felony Domestic Battery,[2] arguing that the evidence is insufficient to support the child molesting conviction and that the sentence is inappropriate in light of the nature of the offenses and his character. Finding that the evidence is sufficient and that the sentence is not inappropriate, we affirm.

# Facts

[2] Jonas married his wife, Rebecca Hawn, on February 12, 2016. At the time, Rebecca had two children from prior relationships, R.W. and O.T. Rebecca gave birth to her and Jonas's son, S.J., in May 2016. As of September 2016, Jonas lived with Rebecca, R.W., O.T., and S.J. The family lived together in one shared bedroom at Jonas's parent's house. R.W. and O.T., aged four and two at the time, slept in a bunk bed, S.J. slept in a crib, and Jonas and Rebecca shared a mattress on the floor.

[3] At some point in September 2016, Billie Richie was babysitting R.W. and another boy when Billie saw R.W. standing over the boy and heard R.W. state that she was "going to kiss him," motioning to the boy's genitals. Tr. Vol. II p. 51. When Billie asked R.W. where she had learned that, R.W. responded that she had learned it from Jonas and that "me and my Mommy kisses Johnny

---

[1] Ind. Code § 35-42-4-3(b).

[2] I.C. § 35-42-2-1.3(a)(1), -1.3(b)(2).

down there." Tr. Vol. II. p. 51. Billie then texted Rebecca that there was an emergency with R.W. and to come pick her up. When Rebecca arrived, Jonas waited in the car while Billie told Rebecca what had happened. Rebecca left with R.W. and told Jonas about R.W.'s statement to Billie, at which point Jonas denied that he had touched R.W., asked R.W. several questions, and attempted to get her to say that Billie's husband, Patrick Richie, was the one who had touched her, not Jonas. Jonas then drove the family to the police station to report that Patrick had molested R.W.

[4] The next day, R.W. was forensically interviewed by Kelly Bridges at the Child Advocacy Center. Bridges testified that she only knew to gather information regarding Patrick, not Jonas. R.W. stated during the interview that Patrick was mean and once had tried to choke her, but that he had never touched her private parts. R.W. told Bridges that Jonas, not Patrick, had previously "tickled" her "where she pees," state's ex. 3, and that, while R.W. and everyone else slept in the shared bedroom, Jonas had climbed into R.W.'s bed, pulled down her pants, and tickled her vagina. R.W. first told Bridges that this had happened in a dream, but later said it happened in real life. When asked, R.W. repeatedly stated that nobody besides Jonas had touched her private parts. Bridges testified that R.W. was consistent throughout the interview and answered questions in a manner appropriate for her age and development.

[5] As a result of the forensic interview, the Department of Child Services (DCS) became involved with the family. DCS employees told Rebecca that Jonas had molested R.W. and that she and the children were required to move out of the

house. However, after four to five weeks, DCS had not yet substantiated the allegations, so Rebecca and the children moved back into Jonas's parents' home.

[6] On November 26, 2016, the day after R.W.'s fifth birthday, Jonas and Rebecca had an altercation at home during an argument about R.W.'s biological father contacting Rebecca. Jonas accused Rebecca of lying and cheating on him, and stated that if Rebecca did not tell him the truth, Jonas would "tell [her] the truth about what he does to the kids." Tr. Vol. II p. 124. Rebecca testified that Jonas then demonstrated what he meant by picking up R.W., bending her over his knee, and rubbing her genitals; he then did the same thing with O.T.

[7] The argument ultimately ended in a shoving match in which Jonas shoved Rebecca into the freezer, causing her to fall to the ground and items on top of the freezer to fall to the floor. Rebecca locked Jonas out of the house and called 911. Rebecca told the officer who responded that Jonas had molested R.W., and R.W. told him that Jonas had tickled her vagina. Jonas was arrested and later called Rebecca from jail, asking her to tell the police she was lying.

[8] On December 1, 2016, Jonas was charged with three counts of Level 4 felony child molesting, one count of Class C felony child molesting,[3] and one count of Level 6 felony domestic battery. A jury trial took place October 16-18, 2018. At trial, R.W. testified about the events of November 26, 2016, but testified that

---

[3] The State later dismissed this count.

she could not remember if Jonas had molested her prior to that date. She testified that nobody besides Jonas had ever touched her private parts.

[9] At the conclusion of the trial, the jury found Jonas guilty of one count of Level 4 felony child molesting and of Level 6 domestic battery; the jury found him not guilty of the remaining charges. On November 29, 2018, Jonas was sentenced to nine years for child molesting and one year for domestic battery, to be served consecutively, for an aggregate sentence of ten years imprisonment. Jonas now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

[10] Jonas's first argument on appeal is that the evidence is insufficient to support his Level 4 felony child molesting conviction. In reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and the reasonable inferences supporting the conviction and will neither assess witness credibility nor reweigh the evidence. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We will affirm unless no reasonable factfinder could find the elements of the crime proved beyond a reasonable doubt. *Id.*

[11] To convict Jonas of Level 4 felony child molesting, the State was required to prove beyond a reasonable doubt that Jonas performed or submitted to any fondling or touching of or by R.W., who was under age fourteen, with the intent to arouse or satisfy the sexual desires of R.W. or himself. I.C. § 35-42-4-3(b). Jonas does not argue that the specific statutory elements are unsupported

by sufficient evidence, but instead asserts that the conviction should be reversed because it is based on incredibly dubious evidence.

[12] To warrant reversal under the rule of incredible dubiosity, there must be: "'1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion; and 3) a complete absence of circumstantial evidence.'" *Smith v. State*, 34 N.E.3d 1211, 1221 (Ind. 2015) (quoting *Moore v. State*, 27 N.E.3d 749, 756 (Ind. 2015)). Application of the rule is very rare and is limited to these specific circumstances because we are extremely hesitant to invade the jury's function to judge witness credibility. *Id.* The applicable standard is "'whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.'" *Levya v. State*, 971 N.E.2d 699, 702 (Ind. Ct. App. 2012) (quoting *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002)).

[13] Here, the rule of incredible dubiosity does not apply because there were multiple witnesses who testified at trial. But even if it did, we would affirm the conviction because the evidence is not inherently contradictory, equivocal, or the result of coercion, and thus fails to meet the incredibly dubious standard.

[14] Jonas claims that R.W.'s testimony was inherently improbable due to the logistics of the allegation and inconsistent statements made by R.W. prior to trial. Specifically, he first argues that the "mere logistics" of Jonas climbing into the bunk bed, pulling down R.W.'s pants, touching her vagina, and returning to his own bed all while the three other family members slept is

inherently improbable. Appellant's Br. p. 13. He then argues that R.W.'s own statements are inherently improbable because of their inconsistencies and her behavior during the forensic interview, during which R.W. initially claimed the touching happened in a dream before stating, repeatedly, that it happened in real life. Jonas also points to R.W.'s apparent inability to maintain focus during the interview, her young age, and the fact that the video interview was unsworn as reasons to treat R.W.'s statements as inherently improbable.

[15] None of these grounds renders the evidence incredibly dubious. We have previously rejected an incredible dubiosity argument where the child victim testified that the defendant molested her while the rest of the family slept in the same room and no one else heard or saw the alleged conduct. *Levya*, 971 N.E.2d at 701-02 ("[W]e cannot say that the testimony of [victim] regarding Levya's actions . . . was so inherently improbable that no reasonable person could believe it."). Here, a reasonable person could likewise believe that Jonas climbed into her bed while she and the rest of the family slept, pulled her pants down, and touched her vagina. Therefore, Jonas's argument regarding the logistics of the allegation fails to meet the incredibly dubious standard.

[16] Further, R.W.'s statement that the touching happened in a dream does not make her later testimony that the touching happened in real life inherently improbable or contradictory. In evaluating whether testimony is inherently contradictory, the question is whether there were inconsistencies within the trial testimony itself, rather than whether it was inconsistent with other evidence or statements made prior to trial. *Smith*, 34 N.E.3d at 1221; *see also Murray v. State*,

761 N.E.2d 406, 409 (Ind. 2002) ("The fact that a witness gives trial testimony that contradicts earlier pre-trial statements does not necessarily render the trial testimony incredibly dubious.").

[17] Here, R.W. made four separate and consistent disclosures about Jonas touching her, and Jonas even demonstrated for Rebecca what he had done. The only times R.W. made statements to the contrary were when Jonas first told her to say Patrick Richie had molested her, and then during the interview with Bridges when R.W. first described the touching as happening in a dream. Anyone waking up in the middle of the night to someone touching them inappropriately might feel as if they were in a dream-like state, especially a four-year-old child. Given R.W.'s consistency at trial and the lack of any additional evidence that her testimony is inherently improbable, we find the evidence sufficient to support the child molesting conviction.

## II. Sentencing

[18] Jonas's second argument on appeal is that his sentence is inappropriate and should be revised in light of the nature of the offenses and his character.

[19] Indiana Appellate Rule 7(B) provides that this Court may revise a statutorily authorized sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In conducting this review, "substantial deference" must be given to the trial court's decision, "since the 'principal role of [our] review is to attempt to leaven the outliers,' and not to achieve a

perceived 'correct' sentence." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014) (quoting *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013)) (internal citations omitted). The defendant bears the burden of proving that the sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[20] For Level 4 felony child molesting, Jonas faced a term of two to twelve years, with an advisory sentence of six years. Ind. Code § 35-50-2-5.5. For Level 6 felony domestic battery, Jonas faced a term of six months to two and one-half years, with an advisory sentence of one year. I.C. § 35-50-2-7(b). The trial court imposed a nine-year term for the child molesting conviction and a one-year term for the domestic battery conviction, to be served consecutively, for an aggregate term of ten years.

[21] With respect to the nature of the offenses, the advisory sentence is treated as "the starting point the Legislature selected as appropriate for the crime committed," *Brown v. State*, 10 N.E.3d 1, 4 (Ind. 2014), and serves as a guideline for imposing a fair and proportional sentence, *Hamilton v. State*, 955 N.E.2d 723, 726 (Ind. 2011). Maximum sentences, in contrast, are reserved for those offenses constituting the "worst of the worst." *Id.* In deciding to increase Jonas's sentence beyond the advisory term, the trial court specifically noted R.W.'s young age, Jonas's position of control or authority over R.W. as her stepfather, and the fact that this was not an isolated incident.

[22] Our courts have consistently held that a victim's age in child molestation offenses generally supports a sliding scale in sentencing, with younger ages of

victims supporting harsher sentences. *Id.* at 727-28 (finding that nine-year-old molestation victim, "although still young, was not of tender years," and that her age did not, on its own, support a harsher sentence); *Light v. State*, 926 N.E.2d 1122, 1124 (finding that the young age of the victims, ages six, one, and two-months, "highlight[ed] the depravity of [defendant's] offenses and her lack of character"). In some cases, young age alone may support a longer sentence. *See Bresson v. State*, 498 N.E.2d 91, 97 (Ind. Ct. App. 1986) (upholding trial court's sentence where the only aggravating factor was two-year-old victim's young age). Here, R.W. was only four years old and thus was of "particularly tender years" when she was molested, which is a valid basis for imposing an increased sentence. *Buchanan v. State*, 767 N.E.2d 967, 971 (Ind. 2002).

[23]     As R.W.'s stepfather, Jonas was in a position of care, control, or authority over R.W., a position this Court has also long recognized as highly relevant in reviewing the nature of the offense for sentencing purposes. *See, e.g.*, *Hamilton*, 955 N.E.2d at 727; *Singer v. State*, 674 N.E.2d 11 (Ind. Ct. App. 1996); *Middlebrook v. State*, 593 N.E.2d 212, 214 (Ind. Ct. App. 1992) ("A reasonable person could conclude that the imposition of the maximum sentence . . . for the offense of child molesting where the victims were defendant's daughter and step-daughter is appropriate."). Here, as R.W.'s stepparent, Jonas abused his position of care and control when he molested her.

[24]     Next, repeatedly committing acts and patterns of molestation over long periods of time, as opposed to committing molestation on one isolated incident, is a valid basis for imposing a higher sentence for child molesting. *Singer*, 674

N.E.2d at 14; *contra Hamilton*, 955 N.E.2d at 723 (revising sentence for child molesting and noting, as one reason, the fact that defendant "engaged in a single act of sexual misconduct as opposed to a long-term pattern of abuse and violence"). Here, although R.W. could only recall the November 2016 incident in her trial testimony, the record suggests Jonas had, in fact, molested R.W. at least once prior to November 2016.

[25] With respect to Jonas's character, we note that other than the two prior convictions for operating while intoxicated, Jonas has no criminal record. Though these two offenses occurred only a few years before the offenses at issue in this case, they are otherwise wholly unrelated in nature and do not, without more, support an enhanced sentence. *See Hamilton*, 955 N.E.2d at 727 (reducing maximum sentence for child molesting in part because defendant's criminal history contained only a misdemeanor DUI and felony robbery, both of which occurred over seven years prior to the molestation and were unrelated to sexual misconduct); *Ruiz v. State*, 818 N.E.2d 927, 929 (Ind. 2004) (concluding that criminal history with four alcohol-related offenses did not support a harsher sentence for felony child molesting, even when alcohol had been involved in the molesting offense).

[26] We concede that there is no right answer as to the proper sentence in this case or in any other, and that our sense of what is appropriate ultimately "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad of other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). "[A]ppellate review

and revision [of sentences] ultimately boils down to the appellate court's 'collective sense of what is appropriate, not a product of a deductive reasoning process.'" *Brown*, 10 N.E.3d at 8 (quoting *Cardwell*, 895 N.E.2d at 1225).

[27] We agree with Jonas that neither his offenses nor his character are the worst of the worst. But the trial court did not impose the maximum term for either conviction. Given this record and our deference to trial courts in sentencing matters, we find that the aggregate ten-year term is not inappropriate in light of the nature of the offenses and Jonas's character.

[28] The judgment of the trial court is affirmed.

Robb, J., and Pyle, J., concur.